621 So.2d 1227 (1993)
ACSTAR INSURANCE COMPANY
v.
AMERICAN MECHANICAL CONTRACTORS, INC.; Highland Bank; Roy F. Bragg and Carolyn Bragg; and Wade M. Cline and Anita Cline.
1910930.
Supreme Court of Alabama.
April 16, 1993.
Rehearing Denied June 4, 1993.
*1228 Thomas R. Elliott, Jr. of London, Yancey, Elliott & Burgess, Birmingham, for appellant.
Edward P. Meyerson and Hub Harrington of Najjar Denaburg, P.C., Birmingham, for appellees.
PER CURIAM.
The defendant/third-party plaintiff Acstar Insurance Company ("Acstar"), appeals from a summary judgment for the defendant American Mechanical Contractors, Inc. ("AMCI"), the defendant-intervenor Highland Bank ("Highland"), and the third-party defendants Roy F. Bragg and Carolyn B. Bragg and Wade M. Cline and Anita Cline.

Facts
The facts are essentially undisputed. Harbert International, Inc. ("Harbert"), a Delaware corporation specializing in public and private construction, was awarded contracts by the United States Government in early 1989 for the construction of a "multi-storage training facility" in Virginia Beach, Virginia (the "Virginia Project") and a mail processing center in Lake Mary, Florida (the "Florida Project"). AMCI, a mechanical contracting company, submitted bids to Harbert for the mechanical and plumbing work on the projects. AMCI was awarded subcontracts on the Virginia Project, on its low bid of $854,000, and on the Florida Project, on its low bid of $3,087,000.
Both subcontracts specifically required AMCI to furnish Harbert performance and payment bonds before any commencement of subcontractor's work at the job site. AMCI contacted its insurance brokers, McGriff, Seibels & Williams, Inc. ("McGriff-Seibels"), to obtain the necessary bonds. McGriff-Seibels then contacted Acstar, an Illinois corporation with its principal place of business in Connecticut. Acstar was actively involved in writing payment and performance bonds and was licensed to do business in Alabama.
On April 25, 1989, Acstar, in a letter to McGriff-Seibels, agreed to execute bonds on the projects in return for premiums in the amount of 2.4% of the contract price and "an irrevocable letter of credit in the amount of $250,000 plus executed indemnification agreement."
AMCI and Roy F. Bragg and Carolyn B. Bragg and Wade M. Cline and Anita Cline ("indemnitors"), executed an indemnity agreement. The indemnitors were the stockholders of AMCI and their spouses. The agreement contained the following provisions:
"2) The Indemnitors will (a) perform all the conditions of each said bond or obligation, and any and all alterations, modifications, renewals, continuations and extensions thereof.
". . . .
"6) The Surety shall have the exclusive right to determine for itself and the Indemnitors whether any claim or suit brought against the Surety or the principal upon any such bond shall be settled or defended and the Surety's decision shall be final and binding upon the indemnitors.
"7) ... [I]t is expressly understood that all monies due and to become due under any contract or contracts covered by the bonds shall be held in trust, whether such monies are in the possession of the Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said bonds."
Citizens and Southern National Bank ("C & S Bank") issued a $250,000 irrevocable letter of credit to Acstar on behalf of AMCI. C & S Bank subsequently assigned its rights under this letter of credit to Highland Bank. The letter of credit was to become effective upon issuance of the payment and performance bonds. Acstar's ability to draw down on the letter of credit was conditioned "in the event you deem it necessary by reason of your having executed bond(s) on behalf of American Mechanical Contractors, Inc."
Acstar issued payment and performance bonds for the two projects on May 18, 1989. *1229 On June 1, 1989, Acstar forwarded the invoice for premiums in the sum of $85,126.50 to McGriff-Seibels.
The bonds, properly executed by Acstar and AMCI, were subsequently delivered to Harbert by AMCI. On June 5, 1989, Harbert wrote to AMCI, acknowledging receipt of the bonds and pointing out that "[t]he bonding company, Acstar, is not on our list of acceptable companies." The letter further stated: "At this point, the bonds, as submitted, are not acceptable because we have no information to judge the capability of Acstar to support the liability the two bonds represent. I suggest we meet on Thursday, June 8, 1989, to discuss the matter further."
AMCI forwarded a copy of this letter, via facsimile, to Acstar on June 7, 1989, with the notation "any help you can give us is needed. We need this information for our meeting on Thursday." Responding the same day, Acstar wrote to AMCI, providing three paragraphs of financial information, including its listing in "Best's Property-Casualty Insurance Reports" (1988 edition), its proposed treasury listing on or before June 30, 1989, and a statement that its "statutory surplus is one of the highest of the approximately 600 surety companies admitted for writing surety bonds." In conclusion, the letter stated:
"In view of the Harbert, June 5, 1989, letter and because you have not paid for the bonds as promised, we expect that you immediately return the original copies of the bonds for cancellation as they are null and void due to Harbert's rejection and due to your nonpayment of the premiums as agreed.
"We expect return of the bond documents immediately."
AMCI did not seek return of the bonds. Harbert replied on June 13, 1989: "[A]fter receipt of additional information on Acstar Insurance Company, we have decided to accept the bonds as submitted by your firm for the above-referenced projects." The bonds, accordingly, were not returned.
On June 22, 1989, Acstar wrote to Harbert, stating, "Harbert's rejection of the bonds in its letter of June 15, 1989 to American Mechanical rendered the bonds null and void." A handwritten notation on this letter indicates that it was received on June 26, 1989.
AMCI then wrote to Acstar on June 26, 1989, confirming that "[p]ayment for the two bonds on the above-referenced jobs will be sent to your office tonight via Federal Express" and stating, "We have been given an acceptance by Harbert International. If you are not willing to accept our check, please give me a call." A July 8, 1989, notation on this letter reads "please file in underwriting file."
On June 27, 1989, Harbert wrote to AMCI and Acstar, stating:
"The bonds were never rejected by Harbert. Acceptability of the bonds was questioned, subject to receipt of additional information from Acstar. Once this information was received the bonds were fully accepted.... Acstar cannot unilaterally cancel the bonds. We have executed bonds in hand and consider them in full force and effect."
Acstar did not refuse the premium payment and did not thereafter declare the bonds null and void or seek their return. Acstar did not return the premium check or call AMCI. Acstar's president, Henry Nozko, Jr., acknowledged that Acstar made no request for the return of the bonds after June 27, 1989. The bonds remained in the possession of Harbert.
Beginning in the last quarter of 1989 and continuing into the spring of 1990, AMCI went into default on both projects in terms of payment and performance, and Harbert was required to expend substantial additional sums to complete AMCI's work and to pay debts due and owing to AMCI's materialmen and suppliers. During the spring of 1990, Harbert declared AMCI in default on both the Virginia Project and the Florida Project. AMCI admitted in its answer to Harbert's complaint that it had failed to make timely payments to suppliers of labor and material and had failed to prosecute and complete its work in a timely manner. When claims by AMCI's creditors were ultimately made on the subject bonds, *1230 Acstar denied its surety obligations, reaffirmed its cancellation of the bonds, and restated its position that the bonds were both null and void.
By two letters dated April 24 and April 26, 1990, Acstar subsequently drew on the full amount of the letter of credit. The documentation presented to C & S Bank as support for the draw upon the letter of credit stated that the bonds issued by Acstar on behalf of AMCI were "still outstanding."
On June 15, 1990, Acstar notified Harbert that the payment and performance bonds were null and void. Acstar wrote to Harbert and explained that Harbert had rejected the bonds on June 7, 1989, and that Acstar had subsequently withdrawn its offer, making the bonds null and void. Thereafter, Acstar informed claimants that the performance and payment bonds were null and void. While Acstar stated that the bonds were null and void, it understood that there was exposure under the bonds because Harbert was contending that the bonds were still in force.
Acstar's denial of all claims made on the subject bonds, and its insistence that the bonds had been canceled and rendered null and void pursuant to Harbert's letter of June 5, 1989, prompted Harbert to institute this action on June 27, 1990. Harbert alleged that it had suffered losses, damage, and costs in excess of $1,000,000 on the bonds. Harbert also claimed punitive damages, alleging that Acstar's refusal to pay under the bonds had been in bad faith. Each of the defendants, Acstar and AMCI, then filed cross-claims against each other. Defendant Acstar also filed a third-party claim against the indemnitors, seeking indemnity under their indemnity agreement. Highland Bank, having been assigned the rights of C & S Bank under the $250,000 letter of credit, petitioned the court to intervene as a party defendant and to assert a cross-claim against Acstar.
In September 1991, Acstar and Harbert entered into a settlement agreement whereby Acstar, in an effort to mitigate potential exposure, paid Harbert $680,000. Under the settlement agreement, Acstar received an assignment of Harbert's claim against AMCI for the amount of $680,000. Acstar remained exposed to claims by labor and material suppliers under the payment bonds.
AMCI and the indemnitors moved for a partial summary judgment against Acstar. Acstar, as cross-claimant and third-party plaintiff, then filed a motion for summary judgment against co-defendant AMCI and against the indemnitors. Acstar sought a summary judgment against AMCI on the grounds that Acstar was an assignee of certain undisputed claims and rights in favor of Harbert and that Acstar was entitled to recover against AMCI under the doctrine of equitable subrogation. These motions were directed only to the contract-based claims; they did not relate to the tort claims asserted against Acstar.
Highland Bank's motion to intervene and the aforementioned motions for summary judgment were heard by the trial court. By an order entered on February 6, 1992, the court granted the motion for partial summary judgment filed by AMCI and the indemnitors against Acstar, and denied Acstar's motion for summary judgment against these parties. Acstar, as well as AMCA and the indemnitors, agrees that the basis for this order was the evidence before the trial court that the subject bonds were null and void and of no force and effect. Thus, the court held, Acstar was precluded from pursuing any claim arising from the indemnity agreement entered into in relation to said bonds. The court made this finding and ordered Acstar to return to AMCI $98,320.07, the funds held by Acstar from the unearned premium payment plus legal interest. The court also granted Highland Bank's motion to intervene and required Acstar to pay to Highland $276,250, the principal amount of the letter of credit plus legal interest. The court made the summary judgment final pursuant to Rule 54(b), A.R.Civ.P. Acstar appealed.[1]
*1231 Rule 56, A.R.Civ.P., sets forth a two-tiered standard for entering a summary judgment. In order to enter a summary judgment, the trial court must determine (1) that there is no genuine issue of material fact and (2) that the moving party is entitled to a judgment as a matter of law. The burdens placed on the moving party by this rule have often been discussed by this Court:
"`The burden is on one moving for summary judgment to demonstrate that no genuine issue of material fact is left for consideration by the jury. The burden does not shift to the opposing party to establish a genuine issue of material fact until the moving party has made a prima facie showing that there is no such issue of material fact. Woodham v. Nationwide Life Ins. Co., 349 So.2d 1110 (Ala.1977); Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortg. Co., 390 So.2d 601 (Ala.1980); Fulton v. Advertiser Co., 388 So.2d 533 (Ala.1980).'"
Berner v. Caldwell, 543 So.2d 686, 688 (Ala.1989) (quoting Schoen v. Gulledge, 481 So.2d 1094 (Ala.1985)).[2]
The standard of review applicable to a summary judgment is the same as the standard for granting the motion, that is, we must determine whether there was a genuine issue of material fact and, if not, whether the movant was entitled to a judgment as a matter of law. Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986); Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala.1986). See also Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990).
The appellant, Acstar, has raised several issues for our review.

I. The Validity of the Bonds
In spite of Acstar's position, during the course of this litigation, that the bonds were never in effect, Acstar now contends that the bonds were never rendered null and void, because, it says, Acstar and AMCI, after Acstar's alleged cancellation of the bonds, treated the bonds in all respects as if they were legal, binding, and in full force in effect. However, AMCI asserts, and the trial court agreed, that testimony taken from officials of Acstar indicated that the bonds had been canceled before acceptance, were never in force and effect, and were at all times null and void.
This cause came before the trial court on cross motions for summary judgment. The defendant AMCI and the indemnitors, as third-party defendants, filed their motion for partial summary judgment against Acstar, and in support of that motion regarding the validity of the bonds, submitted testimony of two of Acstar's officers, Henry W. Nozko, Jr., its president, and Robert Frazer, its vice president.
Nozko stated in his deposition:

*1232 "Q. ... My question is, what is your understanding of the position that Acstar Insurance Company has taken and takes today concerning the bonds that appear to have been issued?
"A. Our position is that the bonds are null and void.
"Q. And for what period of time has that been your position?
"A. Since their issuance.
"Q. Is it your testimony that Acstar, that any bonds issued by Acstar were never in force or effect?
"A. Correct."
Nozko deposition, p. 24.
The "intention of the parties at the time of making [a] contract controls, not subsequent perceptions." Devlin v. Ingrum, 928 F.2d 1084, 1090 (11th Cir.1991). This Court stated in Lilley v. Gonzales, 417 So.2d 161, 163 (Ala.1982), that "the law of contracts is premised upon objective rather than subjective manifestations of intent." Additionally, the Eleventh Circuit Court of Appeals has stated that "it is well recognized in all areas of the law, that a subjective intent on the part of the actor will not alter the relationship or duties created by an otherwise objectively indicated intent." In re Lane, 742 F.2d 1311, 1316 (11th Cir. 1984).
According to those legal principles, even though Acstar's president, Nozko, testified in his deposition that the bonds issued by Acstar on May 18, 1989, were null and void, his testimony as to validity was merely a contention and should not be conclusive on the issue of whether the bonds were valid. To determine whether the bonds were valid, the trial court should have analyzed the evidence before it, which showed Acstar's objective manifestations of intent to validate the bonds when it accepted AMCI's premium payment. A detailed analysis of the communications between AMCI, Acstar, and Harbert regarding the bonds establishes that, as of June 27, 1989, when Acstar accepted AMCI's premium payment, Acstar intended that the bonds issued on May 18, 1989, be valid.
On April 25, 1989, Acstar wrote to AMCI, confirming an agreement between them that Acstar would issue two payment and performance bonds to Harbert on AMCI's behalf. That letter stated: "It is our understanding that you will forward the contracts amounting to $3,100,000 and $850,000 and an irrevocable letter of credit in the amount of $250,000, plus executed indemnification agreement. Upon receipt, we will execute payment and performance bonds at the agreed rate of 2.4%." On April 26, 1989, the indemnitors executed an indemnity agreement with Acstar on AMCI's behalf, and on May 17, 1989, C & S Bank, on behalf of AMCI, established an irrevocable letter of credit in Acstar's favor. On May 18, 1989, Acstar issued the bonds to Harbert.
On June 5, 1989, Harbert wrote AMCI a letter acknowledging receipt of the bonds, and stating: "The bonding company Acstar is not on our list of acceptable companies. At this point, the bonds, as submitted, are not acceptable because we have no information to judge the capability of Acstar to support the liability the two bonds represent." AMCI forwarded a copy of this letter to Acstar on June 7, 1989, with a notation that "any help you can give us is needed." Acstar responded the same day with a letter to AMCI providing three paragraphs of financial information. Acstar's letter stated:
"In view of the Harbert, June 5, 1989, letter and because you have not paid for the bonds as promised, we expect that you immediately return the original copies of the bonds for cancellation as they are null and void due to Harbert's rejection and due to your nonpayment of the premiums as agreed."
Harbert, apparently unaware that Acstar had declared the bonds null and void, wrote to AMCI on June 13, 1989, stating, "[A]fter receipt of the additional information on Acstar ... we have decided to accept the bonds...." Then, Acstar, apparently unaware that Harbert had accepted the bonds, wrote to Harbert on June 22, 1989, stating, "Harbert's rejection of the bonds in its letter of June 5, 1989, ... rendered *1233 the bonds null and void." On June 26, 1989, AMCI wrote to Acstar as follows: "Payment for the two bonds ... will be sent to your office tonight.... We have been given an acceptance by Harbert.... If you are not willing to accept our check, please give me a call."
On June 27, 1989, Harbert wrote to Acstar and AMCI, stating: "We have executed the bonds in hand and consider them in full force and effect." As promised, AMCI forwarded the premium payment to Acstar. Acstar accepted AMCI's premium payment, and from June 27, 1989, until this action was filed on June 27, 1990, Acstar never again asserted that the bonds issued on May 18, 1989, were null and void. During that time, all of the parties relied on the bonds as valid and enforceable. Acstar even stated in a letter dated October 9, 1989, to McGriff, Seibels & Williams, Inc., AMCI's insurance brokers, that AMCI was bonded by Acstar.
The foregoing correspondence establishes that AMCI and Acstar had a valid agreement, confirmed in the letter Acstar wrote to AMCI on April 25, 1989, that Acstar would undertake the role of surety in a relationship between AMCI, Acstar, and Harbert. As of May 18, 1989, AMCI had partially performed its part of the agreement by securing a letter of credit and having the indemnitors execute an indemnity agreement on its behalf. Likewise, Acstar, in performing its part of the agreement, had issued the bonds. Impliedly, Acstar was obligated to give Harbert a good faith opportunity to accept Acstar as a bonding company. The fact that Acstar, in its letters to AMCI on June 5, 1989, and June 22, 1989, may have declared the bonds issued on May 18, 1989, null and void did not relieve Acstar of its obligation under the original agreement between Acstar and AMCI to undertake the role of surety. Acstar's behavior upon learning that Harbert had approved it as a bonding company evidences the fact that Acstar understood that, upon Harbert's approval, Acstar was obligated to issue the bonds on AMCI's behalf.
In AMCI's letter to Acstar dated June 26, 1989, AMCI notified Acstar that Harbert had accepted Acstar as a bonding company and stated that payment for the bonds would be forthcoming unless Acstar objected. We conclude that AMCI's letter is prima facie evidence that on June 26, 1989, AMCI extended to Acstar an offer to validate the bonds issued on May 18, 1989, and, further, that Acstar, by its silent acceptance of AMCI's premium payment, accepted AMCI's offer to validate the outstanding bonds. Even though Nozko denied the validity of the bonds in his deposition testimony taken after Harbert commenced this action, Nozko's subjective contentions do not alter Acstar's objective manifestations of intent to create a suretyship by validating the outstanding bonds. AMCI presented no substantial evidence to rebut Acstar's showing that the bonds were valid.
Based on the foregoing, we hold that the performance and payment bonds issued by Acstar on May 18, 1989, were valid, and, for that reason, the summary judgment for AMCI is due to be reversed.

II. The Validity of the Indemnification Agreement
The indemnitors executed the indemnity agreement to guarantee the obligations undertaken by AMCI as principal on the bonds to be issued by Acstar. The indemnitors personally guaranteed the debt, obligations, or performance of AMCI. Acstar's claim of indemnity against AMCI as principal and against the Braggs and Clines as indemnitors was derived solely from the bonds issued by Acstar.
The trial court held that because the underlying bonds were null and void, there was no consideration for the underlying contract between the indemnitors and Acstar. Because we conclude that the bonds were valid and enforceable, we also conclude that the indemnification agreement was valid and that the summary judgment for the individual indemnitors is due to be reversed also.

*1234 III. Acstar's Settlement and Assignment of Rights from Harbert

Acstar also argues that the trial court failed to properly consider the fact that Acstar had an assignment of Harbert's rights against AMCI to the extent of its $680,000 settlement payment.[3] Thus, Acstar contends that even if the bonds were null and void, under this settlement and assignment of rights by Harbert to Acstar, any amount due from Acstar to AMCI should be set-off against this assignment.
While this argument may have merit, our holding that the bonds were valid makes our consideration of this issue unnecessary. Under our holding that the bonds were valid and enforceable, Acstar would have the right to recover from AMCI, or from the indemnitors, the entire $680,000 it paid to Harbert pursuant to the settlement. Because we hold that the bonds were valid and enforceable, there is no need to calculate any set-off. We believe this result is preferable because the sum that Acstar is entitled to recover is consistent with its actions, and the actions of the other parties, from the inception of the surety relationship.

IV. Intervention of Highland Bank
Highland Bank filed a motion to intervene in this action to protect its interest and/or to assert a claim against Acstar for its draw down of the $250,000 letter of credit originally issued by C & S Bank. The letter of credit was assigned to Highland Bank from C & S Bank. Because the trial court held that the underlying bonds were null and void and that the indemnity agreement failed for lack of consideration, the court simply ordered Acstar to refund all monies obtained pursuant to the nonexistent bonds. Because the indemnitors were the personal guarantors of the letter of credit and AMCI was directly obligated to Highland Bank for this indebtedness, AMCI and the indemnitors stipulated before the trial court that Highland Bank's claim to these funds was undisputed. Pursuant to this stipulation, the trial court awarded Highland Bank $276,250, the amount of the letter of credit plus legal interest.
The basis for recovery in favor of Highland Bank was fundamentally the same as the basis claimed by AMCI: Just as AMCI was entitled to relief because the bonds were null and void, Highland was entitled to recover the funds improperly obtained by Acstar on the letter of credit on the same grounds. However, because we conclude that the trial court erred in holding that the bonds were null and void, we must logically conclude also that Highland Bank had no right to recover the letter of credit proceeds and that the judgment in its favor is also due to be reversed.

Conclusion
Based on the foregoing, we hold that the trial court improperly entered the summary judgment in favor of AMCI, the indemnitors, and Highland Bank. We hold that the trial court erred in holding that the bonds were null and void. Likewise, because we hold that the bonds were valid and enforceable, the underlying indemnity agreement did not fail for want of consideration. In addition, we also hold that Acstar was legally entitled to draw the funds under the letter of credit.
Therefore, the judgment of the trial court is hereby reversed and the cause remanded.
REVERSED AND REMANDED.
HORNSBY, C.J., and ALMON, SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.
MADDOX, J., dissents.
*1235 MADDOX, Justice (dissenting).
The conclusion reached by the majority appears on its face to be correct, but in reaching that conclusion the majority must apply equitable principles that were neither presented, nor argued, to the trial court. The trial court's ruling was based upon uncontradicted evidence that the bonds were null and void. To permit Acstar Insurance Company to argue before the trial court that the bonds were null and void and then to argue on appeal that they were valid seems legally inappropriate. Consequently, I must respectfully disagree with the holding of the majority.
The uncontroverted evidence shows that in the action underlying this appeal Acstar took the position that the bonds made the basis of this action had been canceled, were of no force and effect, and were at all times null and void. In fact, Acstar, on numerous occasions, requested the trial court to make a finding of fact that the bonds were null and void. As Acstar requested, the trial court found that the bonds were indeed null and void. Consequently, based on this holding, no principal-surety relationship could have existed between AMCI and Acstar.
In view of my opinion that the bonds were null and void, I likewise am of the opinion that the trial court correctly decided that the indemnity agreement executed by the indemnitors must fail for lack of consideration. Acstar's claim of indemnity against AMCI as principal and against the Braggs and the Clines as indemnitors was derived solely from the bonds, which, by Acstar's admission, were canceled and rendered null and void. The law is clear that Acstar cannot recover against the principal or an indemnitor on an indemnity agreement that is predicated upon an underlying contract that is null and void; if the underlying contract was null and void, then there was no consideration for the contract with Acstar. As a result, there can be no indemnity from either the principal or the indemnitors.
Because I believe the trial court correctly ruled that the bonds were null and void, I must also disagree with the majority's holding regarding the letter of credit proceeds recovered by Highland Bank. In short, I am of the opinion that the trial court properly entered the summary judgment in favor of AMCI and the indemnitors, holding that (1) the bonds were null and void; (2) the indemnity agreement failed for want of consideration; and (3) Acstar was not legally entitled to the funds under the letter of credit. However, I also believe that the trial court improperly ignored Acstar's settlement and assignment of rights from Harbert. Acstar had an assignment of Harbert's rights to the extent of its $680,000 settlement payment. Any monies due to be refunded to AMCI should have been set-off against this settlement payment. This includes the unearned premium payment on the bonds, plus legal interest of $98,323.07 that the trial court ordered Acstar to refund.
In addition, although the trial court, at first glance, appears to have reached the correct legal conclusion in regard to the letter of credit proceeds, I think that the court erred when it failed to consider Acstar's rights under the settlement agreement. This amount, $276,250, was also due to be set-off against Acstar's $680,000 settlement payment. The trial court failed to consider Acstar's rights under the assignment and improperly allowed AMCI, which was directly obligated for this indebtedness, to recover this money on behalf of Highland Bank.
NOTES
[1] Acstar's notice of appeal listed Acstar as appellant and AMCI and Highland Bank as appellees. However, the notice of appeal specifically refers to the motions for summary judgment granted by Judge Leach. His order entered summary judgment for AMCI as well as for the indemnitors (the Clines and the Braggs), based upon their joint motion for a partial summary judgment. AMCI and the indemnitors are all represented by the same attorneys, and the issues involving the indemnitors raised in appellant Acstar's brief have been addressed in appellee AMCI's brief. We recognize that this appeal from Judge Leach's summary judgment against Acstar is really an appeal as to all parties that prevailed in their motions for summary judgmentincluding the indemnitors (the Clines and the Braggs). Thus, we recognize that the indemnitors are also parties to this appeal; we have styled this case accordingly.
[2] Because this action was not pending on June 11, 1987, Ala.Code 1975, § 12-21-12, mandates that the nonmovant meet its burden by "substantial evidence." Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Under the substantial evidence test the nonmovant must present "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). More simply stated, "[a]n issue is genuine if reasonable persons could disagree." Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 481 (1982).
[3] We note that AMCI contends that the references to the issues of the Harbert settlement and assignment and to the doctrine of equitable subrogation made a part of Acstar's argument were never placed in issue before the trial court. AMCI argues that there was no pleading or evidence ever directed to these issues and that, therefore, they cannot be raised or addressed on appeal. However, these issues were raised in Acstar's motion for summary judgment against AMCI and the indemnitors. (R. 570.) In addition, Acstar, in a prior brief in support of a motion for summary judgment, had stated arguments regarding these issues. (R. 435-36.)